1
2
3
4
5
6                          UNITED STATES DISTRICT COURT
7                         WESTERN DISTRICT OF WASHINGTON

8    JAMES T. HILL, Derivatively On Behalf of
     CTI BIOPHARMA CORP.                           NO.  2:16-cv-1250
9
                Plaintiff,                          **VERIFIED DERIVATIVE COMPLAINT**
10
     v.                                             JURY TRIAL DEMANDED
11
     JAMES A. BIANCO, LOUIS A. BIANCO,
12   PHILLIP M. NUDELMAN, JOHN H. BAUER,
     KAREN IGNAGNI, RICHARD L. LOVE,
13   MARY O. MUNDINGER, FREDERICK W.
     TELLING, and REED V. TUCKSON,
14
                Defendants,
15
     -and-
16
     CTI BIOPHARMA CORP.
17
                Nominal Defendant.
18

19

20

21          Plaintiff James T. Hill ("Plaintiff"), by and through his undersigned counsel, derivatively

22   on behalf of Nominal Defendant CTI Biopharma Corp. ("CTI" or the "Company"), submits this

23   Verified Shareholder Derivative Complaint (the "Complaint").  Plaintiff's allegations are based

24   upon his personal knowledge as to himself and his own acts, and upon information and belief,

25   developed from the investigation and analysis by Plaintiff's counsel, including a review of

26   publicly available information, including filings by CTI with the U.S. Securities and Exchange

     Commission ("SEC"), press releases, news reports, analyst reports, investor conference

     transcripts, publicly available filings in lawsuits, and matters of public record.

**COMPLAINT- 1**                          **Lee & Lee, PS**
                                          1001 4th Ave., Ste. 4368
                                          Seattle, WA  98154
                                          (206) 458-6986

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action brought in the right, and for the benefit, of CTI against certain of its officers and directors seeking to remedy Defendants' breach of fiduciary duties, gross mismanagement and unjust enrichment that occurred between March 4, 2014 and the present (the "Relevant Period") and have caused substantial harm to CTI.

2.      CTI is a biopharmaceutical company that provides medical research services, and develops clinical treatment and drugs for various cancers.  One of the Company's most advanced pipeline products was pacritinib, a treatment for myelofibrosis.

3.      On September 24, 2015, CTI filed a Registration Statement/Prospectus Supplement ("Prospectus"), offering of 10,000,000 shares, at a price of $1.57 per share.  It was in this Prospectus that the CTI Board of Directors ("the "Board") was put on notice that "the Independent Data Monitoring Committee ('IDMC'), in place at the time for the PERSIST program recommended patients on the best available therapy, or BAT, arm should not crossover to receive pacritinib due to non-statistically significant safety concerns in patients who crossover after 24 weeks . . . ."   The Board rejected the recommendation and "determined that no modifications to the ongoing trials were required." This was disclosed for the first time in the Prospectus.

4.      On February 8, 2016, Defendants caused CTI to issue a press release announcing that a partial clinical hold has been placed on pacritinib by the U.S. Food and Drug administration ("FDA").  Under the FDA's clinical hold, the Company, "may not enroll new patients or start pacritinib as an initial or crossover treatment, and (ii) patients on pacritinib not deriving benefit after 30-weeks of pacritinib treatment should stop pacritinib."  The Company further disclosed that, "[i]n its written notification, the FDA cited the reasons for the partial clinical hold were that it identified the following fatal and life-threatening safety issues in pacritinib-treated patients: heart failure, hemorrhage including intracranial hemorrhage, and arrhythmias including sudden death, and the FDA has also noted excess mortality in pacritinib-treated patients compared to the control arm in the PERSIST-1 clinical trial evaluating pacritinib."

5.      On this news, shares of CTI declined $0.68 per share, or over 60% to close at $0.44 on February 8, 2016, on unusually heavy volume.

**Lee & Lee, PS**
1001 4th Ave., Ste. 4368
Seattle, WA  98154
(206) 458-6986

6.     On February 9, 2016, Defendants caused the Company to issue a press release announcing that the FDA had placed a full clinical hold on pacritinib.  The press release stated in relevant part:

On February 8, 2016, the U.S. Food and Drug Administration (the "FDA") notified the Company that a full clinical hold has been placed on pacritinib (IND 078406), the Company's investigational oral kinase inhibitor with specificity for JAK2, FLT3, IRAK1 and CSF1R.  A full clinical hold is a suspension of the clinical work requested under an investigational new drug application. Under the full clinical hold, all patients currently on pacritinib must discontinue pacritinib immediately, and the Company may not enroll any new patients or start pacritinib as initial or crossover treatment.   In its written notification, the FDA noted interim overall survival results from PERSIST-2 showing a detrimental effect on survival consistent with the results from PERSIST-1, and that deaths in PERSIST-2 in pacritinib-treated patients include intracranial hemorrhage, cardiac failure and cardiac arrest.

The FDA made recommendations that supersede the recommendations made by the FDA in connection with the partial clinical hold imposed by the FDA on February 4, 2016.   The current recommendations include conducting Phase 1 clinical trials for dose exploration of pacritinib in patients with myelofibrosis, submitting final study reports and datasets for PERSIST-1 and PERSIST-2, providing certain notifications, revising relevant statements in the related Investigator's Brochure and informed consent documents and making certain modifications to protocols. In addition, the FDA recommended that the Company request a meeting prior to submitting a response to full clinical hold.

COMPLAINT- 3

**Lee & Lee, PS**
1001 4th Ave., Ste. 4368
Seattle, WA  98154
(206) 458-6986

The Company has withdrawn its previously submitted new drug application for pacritinib until the Company has had a chance to evaluate appropriate steps for pacritinib. All clinical investigators worldwide have been delivered a notice of the full clinical hold.

7.    On this news, the Company's shares fell over 40% during intraday trading on February 10, 2016, on unusually heavy volume of over 15 million shares.

8.    Throughout the Relevant Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that pacritinib was attributed as a potential cause in the death and injuries of several patients; (2) that the Company's clinical trials showed the dangers of pacritinib usage; (3) that the Company's new drug application for pacritinib would likely be withdrawn; (4) that, as such, the Company's future revenues were impaired; (5) that the company lacked adequate internal controls; and (6) that, as a result of the foregoing, the Company's financial statements and Defendants' statements about CTI's business, operations, and prospects, were materially false and misleading at all relevant times.

## JURISDICTION AND VENUE

9.    The Court has jurisdiction over all claims under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10.    The Court has jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in Washington, or is an individual who has sufficient minimum contacts with Washington so as to render the exercise of jurisdiction by the Washington courts permissible under traditional notions of fair play and substantial justice.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the defendants either resides in or maintains executive offices in this District, including Nominal Defendant CTI, a substantial portion of the transactions and wrongs complained of herein – including Defendants' primary participation in the wrongful acts detailed herein and

COMPLAINT- 4

Lee & Lee, PS
1001 4th Ave., Ste. 4368
Seattle, WA  98154
(206) 458-6986

aiding and abetting in violations of fiduciary duties owed to CTI – occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

12. In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

<u>CODE OF BUSINESS CONDUCT AND ETHICS</u>

13. As members of CTI's Board, the Director Defendants (defined below) were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies, and assuring the integrity of its financial and business records.

14. Further, the conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of CTI, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that Defendants were aware posed a risk of serious injury to the Company.

15. CTI maintains a Code of Ethics for Senior Executives and Financial Officers (the "Code of Ethics"), which states the following:

> **Accurate Periodic Reporting and Disclosure**
>
> As a public company, CTI is required to file periodic and other reports with the Securities and Exchange Commission ("SEC"). CTI's policy is to make full, fair, accurate, timely and understandable disclosure in compliance with all applicable laws and regulations in all reports and documents that CTI files with, or submits to, the SEC and in all other public communications made by CTI. As a Senior Officer, you are required to promote compliance with this policy and to abide by all CTI standards, policies and procedures designed to promote compliance with this policy.

COMPLAINT- 5

**Lee & Lee, PS**
1001 4th Ave., Ste. 4368
Seattle, WA  98154
(206) 458-6986

16.     Further, the Board has also adopted Amended and Restated Corporate Governance Guidelines ("Corporate Governance Guidelines"), which includes the following requirements in relevant part:

### DIRECTOR RESPONSIBILITIES

The fundamental role of the directors is to exercise their business judgment to act in what they reasonably believe to be the best interests of the Company and its shareholders. In fulfilling that responsibility the directors should be able to rely on the honesty and integrity of the Company's senior management and legal, accounting, financial and other advisors. The directors should have the benefit of directors' and officers' insurance, paid by the company, to indemnification to the fullest extent allowed under the Washington law and the Company's charter, and to exculpation as provided by Washington law and the Company's charter, bylaws and contractual arrangements. Board members are expected to prepare for, attend and participate in all meetings of the Board and its committees of which they are a member, and are encouraged to attend the meetings of all other committees. Board members are also expected to spend the time needed and meet as often as necessary to properly discharge their obligations. Information and data that is important to the Board's understanding of the business to be conducted at a Board or committee meeting should generally be distributed in writing to the directors prior to the meeting, so that Board meeting time may be conserved and discussion time focused on questions that the Board has about the materials. Particularly sensitive subject matters may be discussed at the meeting without advance distribution of written materials.

### PARTIES

**Plaintiff**

COMPLAINT- 6

**Lee & Lee, PS**
1001 4th Ave., Ste. 4368
Seattle, WA  98154
(206) 458-6986

17.     Plaintiff James T. Hill is, and was at relevant times, a shareholder of CTI. Plaintiff Hill purchased 560 shares of CTI on May 29, 2009, and retains these shares as of the date of the Complaint's filing.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff is a citizen of California.

**Nominal Defendant**

18.     Nominal Defendant CTI is a Washington company with offices and operations in London, United Kingdom, and Milan, Italy.  CTI is a biopharmaceutical company that provides medical research services, and develops clinical treatment and drugs for various cancers.  One of the Company's most advanced pipeline products was pacritinib, a treatment for myleofibrosis.

**Director Defendants**

19.     **Defendant James A. Bianco** ("J. Bianco") is the principal founder of CTI and has served as the Company's Chief Executive Officer ("CEO") and a director since September 1991. Upon information and belief, J. Bianco is a citizen of Washington.

20.     **Defendant Phillip M. Nudelman** ("Nudelman") has served as a director of the Company since March 1994 and as Chairman of the Board ("Board") since October 2005. Nudelman is also the Chair of the Nominating and Governance Committee and is a member of the Audit Committee and the Compensation Committee.   Upon information and belief, Nudelman is a citizen of Washington.

21.     **Defendant John H. Bauer** ("Bauer") previously served as a director of the Company from October 2005 until his resignation from the Board on October 20, 2015.  Upon information and belief, Bauer is a citizen of Washington.

22.     **Defendant Karen Ignagni** ("Ignagni") previously served as a director of the Company from January 2014 until her resignation from the Board on November 5, 2015.  Upon information and belief, Ignagni is a citizen of New York.

23.     **Defendant Richard L. Love** ("Love") has served as a director of the Company since September 2007.  Love is currently the Chair of the Audit Committee and is described by the Company as an "audit committee financial expert," as defined under the rules and regulations of the SEC and that he has accounting and related financial management expertise within the meaning of the NASDAQ Stock Market rules.  He is also a member of the Compensation

COMPLAINT- 7

**Lee & Lee, PS**
1001 4th Ave., Ste. 4368
Seattle, WA  98154
(206) 458-6986

—

Committee and the Nominating and Governance Committee.  Upon information and belief, Love is a citizen of Texas.

24.    **Defendant Mary O. Mundinger** ("Mundinger") served as a director of the Company from April 1997 until April 29, 2016.  Mundinger was a member of the Compensation Committee and the Nominating and Governance Committee.  Upon information and belief, Mundinger is a citizen of New York.

25.    **Defendant Frederick W. Telling** ("Telling") has served as a director of the Company since December 2006. Telling is the Chair of the Compensation Committee, and is also a member of the Audit Committee.   Upon information and belief, Telling is a citizen of New York.

26.    **Defendant Reed V. Tuckson** ("Tuckson") has served as a director of the Company since September 2011.  Tuckson is a member of the Nominating and Governance Committee.  Upon information and belief, Tuckson is a citizen of Georgia.

27.    **Defendant John H. Bauer** ("Bauer") previously served as a director of the Company from October 2005 until his resignation from the Board on October 20, 2015.  Prior to his resignation, Bauer was the Chair of the Audit Committee. Bauer signed or authorized the signing of the Registration Statement/Prospectus Supplement.   Bauer is a defendant in the Securities Class Actions.  Upon information and belief, Bauer is a citizen of Washington.

28.    Defendants J. Bianco, Nudelman, Bauer, Ignagni, Love, Mundinger, Telling, Tuckson, and Bauer are herein referred to as the "Director Defendants."

**Executive Officer Defendant**

29.    **Defendant Louis A. Bianco** ("L. Bianco") is a founder of CTI and has served as the Company's Executive Vice President, Finance and Administration since February 1992.  He previously served as a director of CTI from September 1991 to April 1992 and from April 1993 to April 1995.  L. Bianco is the brother of Defendant J. Bianco.  Upon information and belief, L. Bianco is a citizen of Rhode Island.

**Non-Party**

30.    **Non-Party Matthew D. Perry** ("Perry") has been a Company director since January 2016.  Perry is the President of BVF Partners and portfolio manager for the underlying funds managed by the firm.  BVF Partners is a private investment partnership that has focused on

COMPLAINT- 8

small-cap, value oriented investment opportunities for more than 20 years. BVF owns 15.97% of all the outstanding shares of the Company stock.

## Materially False and Misleading Statements

## Issued During the Class Period

31. The Relevant Period begins on March 3, 2014. On this day, Defendants caused the Company to issue a press release announcing the initiation of a Phase 3 clinical trial known as PERSIST-2 for the evaluation of pacritinib. The press release stated in relevant part:

> PERSIST-2, [ ] will evaluate pacritinib, a novel, investigational JAK2/FLT3 inhibitor, in patients with myelofibrosis whose platelet counts are less than or equal to 100,000 per microliter (uL). The trial is expected to enroll up to 300 patients in North America, Europe, Australia and New Zealand within 12 to 14 months. In October 2013, CTI reached agreement with the U.S. Food and Drug Administration (FDA) on a Special Protocol Assessment (SPA) for the PERSIST-2 trial, which is a written agreement between CTI and the FDA regarding the planned design, endpoints and statistical analysis approach of the trial to be used in support of a potential New Drug Application, or NDA, submission. PERSIST-2 is the second of two planned Phase 3 trials in the pacritinib development program for myelofibrosis.

> "JAK2 inhibitors have revolutionized the treatment of myelofibrosis by providing patients with an effective way to manage their disease," said Srdan Verstovsek, MD, PhD, principal investigator of PERSIST-2 and Professor, Leukemia Department, Division of Cancer Medicine, Chief, Section for Myeloproliferative Neoplasms, Leukemia Department, and Director, Clinical Research Center for MPNs, at The University of Texas MD Anderson Cancer Center. "However, I believe there remains a significant unmet medical need for new therapies,

COMPLAINT- 9

particularly for patients who present with or develop thrombocytopenia while on treatment. We are pleased to have the PERSIST-2 trial underway to evaluate the ability of pacritinib to address this issue."

32.    The Form 10-K filed on March 4, 2014 ("2013 Form 10-K") also reported the following regarding the clinical trials for testing of pacritinib:

In January 2013, we initiated clinical trial sites and began enrolling patients with myelofibrosis in a Phase 3 clinical trial known as the PERSIST-1, or PAC325, trial.  PERSIST-1 is a multicenter, open label, randomized, controlled Phase 3 trial evaluating the efficacy and safety of pacritinib with that of best available therapy in patients with primary myelofibrosis. A total of approximately 320 eligible patients are expected to be randomized 2:1 to receive either pacritinib 400 mg taken orally once daily or the best available therapy.  Best available therapy includes any physician-selected treatment other than JAK inhibitors, and there is no exclusion by patient platelet count.

The primary endpoint of the PERSIST-1 trial is the percentage of patients achieving a 35 percent or greater reduction in spleen volume from baseline to Week 24 as measured by MRI or computed tomography, or CT, scan.  The secondary endpoint is the percentage of patients achieving a 50 percent or greater reduction in Total Symptom Score, or TSS, from baseline to 24 weeks as measured by tracking specific symptoms on a form. At the time of initiation of the trial, PERSIST-1 utilized the original Myeloproliferative Neoplasm Symptom Assessment (MPN-SAF TSS) instrument, to measure TSS reduction. However, we have substantially concluded the process of amending the PERSIST-1 trial protocol to replace the original MPN-SAF TSS instrument

COMPLAINT- 10

with a new instrument, known as the MPN-SAF TSS 2.0, which is also being used for recording patient-reported outcomes for the PERSIST-2 trial detailed below. In connection with this amendment, we expect that enrollment in PERSIST-1 will be increased from 270 to approximately 320 patients. The trial is currently enrolling patients at clinical sites in Europe, Australia, New Zealand, Russia and the U.S. More details on the PERSIST-1 trial can be found at www.clinicaltrials.gov. We anticipate reporting topline data for PERSIST-1 in the second half of 2014.

In March 2014, we opened clinical trial sites for enrollment of patients with myelofibrosis in the second Phase 3 clinical trial known as the PERSIST-2, or PAC326, trial. PERSIST-2 is a multicenter, open-label randomized, controlled clinical trial evaluating pacritinib in up to 300 patients with myelofibrosis whose platelet counts are less than or equal to 100,000/μL. The trial will evaluate pacritinib as compared to best available therapy, including approved JAK2 inhibitors that are dosed according to the product label for myelofibrosis patients with thrombocytopenia.

33.    The 2013 Form 10-K was signed by Defendants Nudelman, J. Bianco, L. Bianco, Bauer, Ignagni, Love, Mundinger, Singer, Telling and Tuckson.

34.    On April 29, 2014, Defendants caused the Company to file its Quarterly Report with the SEC on Form 10-Q for the period ending March 31, 2014.  Regarding the PERSIST clinical trials the Form 10-Q stated in relevant part:

Our lead development candidate, pacritinib, is an oral inhibitor of both Janus Kinase 2, or JAK2, and FMS-like tyrosine kinase (FLT3), which demonstrated meaningful clinical benefit and good tolerability in myelofibrosis patients in Phase 2 clinical trials.

**COMPLAINT**- 11

**Lee & Lee, PS**
1001 4th Ave., Ste. 4368
Seattle, WA  98154
(206) 458-6986

Myelofibrosis is a blood-related cancer caused by the accumulation of malignant bone marrow cells that triggers an inflammatory response, scarring the bone marrow and limiting its ability to produce red blood cells prompting the spleen and liver to take over this function.  Symptoms that arise from this disease include enlargement of the spleen, anemia, extreme fatigue, itching and pain. We believe pacritinib may offer an advantage over other JAK inhibitors through effective relief of symptoms with less treatment emergent thrombocytopenia and anemia.

In collaboration with Baxter International, Inc., or Baxter, pursuant to our worldwide license agreement to develop and commercialize pacritinib, or the Baxter Agreement, we are pursuing a broad approach to advancing pacritinib for patients with myelofibrosis by conducting two Phase 3 clinical trials: one in a broad set of patients without limitations on blood platelet counts, the PERSIST-1 trial, which was initiated in January 2013; and the other in patients with low platelet counts, the PERSIST-2 trial, which opened for enrollment in March 2014. In October 2013, we reached an agreement with the U.S. Food and Drug Administration, or FDA, on a Special Protocol Assessment for PERSIST-2. The trial, together with PERSIST-1, is intended to support registration in the U.S. and the E.U.  For additional information on this agreement, please see the discussion in Part I, Item 2, "License Agreements and Additional Milestone Activities – Baxter."

35.    On August 4, 2014, Defendants caused the Company to file its Quarterly Report with the SEC on Form 10-Q for the period ending June 30, 2014.  The Company's Form 10-Q was signed by Defendants J. Bianco and L. Bianco.  Regarding the PERSIST clinical trials, the June 30, 2014 Form 10-Q stated that, "[w]e believe pacritinib may offer an advantage over other JAK inhibitors through effective relief of symptoms with less treatment-emergent

Lee & Lee, PS
1001 4th Ave., Ste. 4368
Seattle, WA  98154
(206) 458-6986

thrombocytopenia and anemia," and "[i]n August 2014, we received a $20 million development milestone payment under the Baxter Agreement following completion of enrollment in PERSIST-1."

36.     On October 30, 2014, Defendants caused the Company to file its Quarterly Report with the SEC on Form 10-Q for the period ending September 30, 2014.  The Company's Form 10-Q was signed by Defendants J. Bianco and L. Bianco.  Regarding the PERSIST clinical trials, the September 20, 2014 Form 10-Q stated in relevant part:

> In October 2013, we reached an agreement with the U.S. Food and Drug Administration, or FDA, on a Special Protocol Assessment for PERSIST-2, which is actively enrolling patients.  The two clinical trials are intended to support a New Drug Application, or NDA, planned regulatory submission in the U.S. in late 2015, followed by a planned Marketing Authorization Application submission in Europe in 2016.  In August 2014, pacritinib was granted Fast Track designation by the FDA for the treatment of intermediate and high risk myelofibrosis, including but not limited to patients with disease-related thrombocytopenia, patients experiencing treatment-emergent thrombocytopenia on other JAK2 therapy or patients who are intolerant of, or whose symptoms are sub-optimally managed on, other JAK2 therapy.  The FDA's Fast Track process is designed to facilitate the development and expedite the review of drugs to treat serious conditions and fill an unmet medical need.

37.     On March 12, 2015, Defendants caused the Company to file its Annual Report with the SEC on Form 10-K for the period ending December 31, 2014 ("2014 Form 10-K").  The Company's Form 10-K was signed by Defendants J. Bianco and L. Bianco. Regarding the PERSIST clinical trials, the 2014 Form 10-K stated in relevant part:

> In August 2014, pacritinib was granted Fast Track designation by the FDA for the treatment of intermediate and high risk myelofibrosis, including, but not limited, to patients with disease

**COMPLAINT- 13**

related thrombocytopenia, patients experiencing treatment emergent thrombocytopenia on other JAK2 therapy or patients who are intolerant of, or whose symptoms are sub-optimally managed on, other JAK2 therapy. The FDA's Fast Track process is designed to facilitate the development and expedite the review of drugs to treat serious conditions and fill an unmet medical need. The PERSIST-1 and PERSIST-2 clinical trials are intended to support a potential regulatory submission to the FDA or the European Medicines Agency, or the EMA.

In March 2015, we reported top-line results for the primary endpoint from PERSIST-1 for the treatment of adult patients with myelofibrosis. The primary endpoint of the trial was the proportion of patients achieving a 35 percent or greater reduction in spleen volume from baseline to Week 24 as measured by magnetic resonance imaging, or MRI, or computerized tomography, or CT, when compared with physician-specified best available therapy, excluding treatment with JAK2 inhibitors.  The trial met its primary endpoint in the intent-to-treat population with statistically significant activity observed in patients irrespective of their initial platelet count, including patients with very low platelet counts at study entry.  For additional information concerning the top-line results, *see* Part I, Item 1, "Business—Development Candidates— Pacritinib—Development in Myelofibrosis".

\*       \*       \*

The safety profile in the trial was consistent with prior Phase 2 trials. While the most common treatment emergent adverse events were diarrhea, nausea and vomiting, the incidence of grade 3 events was lower than observed in Phase 2 trials. No grade 4 gastrointestinal adverse events were reported. Three patients

COMPLAINT- 14

discontinued therapy and nine patients required dose reduction for diarrhea. Preliminary analysis suggests that very few patients discontinued treatment while on pacritinib or required a dose reduction due to treatment-related anemia or thrombocytopenia. Additional data from ongoing analyses along with top-line results from PERSIST-1 will be submitted for presentation at a scientific meeting.

Our ongoing PERSIST-2 trial is a multi-center, open-label, randomized, controlled Phase 3 trial evaluating pacritinib in up to 300 patients with myelofibrosis whose platelet counts are less than or equal to 100,000 per microlitre. This ongoing study is evaluating pacritinib as compared to best available therapy, including the approved JAK1/JAK2 inhibitor dosed according to the product label for myelofibrosis patients with thrombocytopenia. Patients are being randomized (1:1:1) to receive 200 mg pacritinib twice daily, 400 mg pacritinib once daily or best available therapy.

In October 2013, we reached an agreement with the FDA on a SPA for the PERSIST-2 trial regarding the planned design, endpoints and statistical analysis approach of the trial to be used in support of a potential regulatory submission. Under the SPA, the agreed upon co-primary endpoints are the percentage of patients achieving a 35 percent or greater reduction in spleen volume measured by MRI or CT scan from baseline to week 24 of treatment and the percentage of patients achieving a TSS reduction of 50 percent or greater using eight key symptoms as measured by the modified MPN-SAF TSS2.0 diary from baseline to week 24.

COMPLAINT- 15

38.     The 2014 Form 10-K was signed by Defendants Nudelman, J. Bianco, L. Bianco, Bauer, Ignagni, Love, Mundinger, Singer, Telling and Tuckson.

39.     On May 6, 2015, Defendants caused the Company to file its Quarterly Report with the SEC on Form 10-Q for the period ending March 31, 2015.  The Company's Form 10-Q was signed by Defendants J. Bianco and L. Bianco.

40.     Also, on May 6, 2015, Defendants caused the Company to issue a press release, disclosing its quarterly results and providing the following guidance regarding the PERSIST clinical trials:

> "After reporting positive top-line results from the PERSIST-1 Phase 3 clinical trial of pacritinib during the quarter, we have subsequently received positive feedback from a number of treating physicians who are excited by the potential opportunity for pacritinib to meet a current unmet medical need in the treatment of patients with myelofibrosis, specifically in the portion of patients that have low-blood platelets as a result of their disease or other treatment," said James A. Bianco, M.D., CTI BioPharma's President and CEO. "We look forward to the oral presentation of data from this trial at ASCO and remain focused on completing the second pacritinib Phase 3 trial, PERSIST-2, in the second-half of this year and, with our partner Baxter, starting a planned regulatory submission late in 2015."

41.     On August 6, 2015, Defendants cause the Company to file its Quarterly Report with the SEC on Form 10-Q for the period ending June 30, 2015.  The Company's Form 10-Q was signed by Defendants J. Bianco and L. Bianco.

42.     Also, on August 6, 2015, Defendants caused the Company to issue a press release, disclosing its quarterly results and providing the following guidance regarding the PERSIST clinical trials:

> "The significant interest from the oncology community generated by the Phase 3 PERSIST-1 clinical data, presented at the ASCO

COMPLAINT- 16

Lee & Lee, PS
1001 4th Ave., Ste. 4368
Seattle, WA  98154
(206) 458-6986

and EHA conferences, supports our belief that there remains a significant unmet medical need for patients with myelofibrosis and that pacritinib may play an important role in addressing the current treatment gaps for this disease," said James A. Bianco, M.D., CTI BioPharma's President and CEO. "Armed with these positive data from the PERSIST-1 trial, our efforts are now directed toward exploring potential regulatory pathways in the U.S., while our partner Baxalta expects to submit a marketing application in Europe before the end of the year. Concurrently, we remain committed to completing the second pacritinib Phase 3 trial, PERSIST-2, and to continuing investigation into the potential for pacritinib in other blood-related cancers outside of myelofibrosis."

**Second Quarter 2015 and Recent Highlights Clinical**:

In May, data from the PERSIST-1 Phase 3 clinical trial of pacritinib for the treatment of patients with myelofibrosis showed that, compared to best available therapy (exclusive of a JAK inhibitor), or BAT, pacritinib therapy resulted in a significantly higher proportion of patients with spleen volume reduction and control of disease-related symptoms. Treatment with pacritinib resulted in improvements in severe thrombocytopenia and severe anemia, eliminating the need for blood transfusions in a quarter of patients who were transfusion dependent at the time of enrollment. Gastrointestinal symptoms were the most common adverse events and typically lasted for approximately one week. A limited number of patients discontinued treatment due to side effects. There were no Grade 4 gastrointestinal events reported. These results were presented in a late-breaking oral session at the 51st Annual Meeting of the American Society of Clinical Oncology.

COMPLAINT- 17

In June, results from PERSIST-1 patient-reported outcome (PRO) and other quality of life measures presented at a late breaking oral session at the 20th Congress of the European Hematology Association (EHA) showed significant improvements in symptom score with pacritinib therapy compared to BAT across the symptoms reported in the presentation.

In June, data from an investigator-sponsored Phase 2 trial of tosedostat in elderly patients with either primary acute myeloid leukemia (AML), or AML that has evolved from myelodysplastic syndrome (MDS) showed that the combination of tosedostat with low-dose cytarabine/Ara-C (LDAC) resulted in an overall response rate of 54 percent in elderly patients with AML, with 45 percent of patients achieving durable complete responses. These findings were also presented at the EHA congress.

43.    On September 24, 2015, Defendants caused the Company to file with the SEC its Prospectus Supplement pursuant to Rule 424(b)(5) to complete the offering of 10,000,000 shares of common stock offered in connection with a Registration Statement previously filed with the SEC.  Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

44.    With respect to the PERSIST clinical trials and the future prospects of pacritinib, the Registration Statement, in relevant part, stated:

**Planned NDA Submission for Pacritinib**

On September 23, 2015, we announced our plan to submit an NDA to the FDA following a productive pre-NDA meeting for pacritinib. We expect to submit the NDA in the fourth quarter of 2015 and to request accelerated approval for the treatment of patients with intermediate and high-risk myelofibrosis with low platelet counts of less than 50,000 per microliter (<50,000/uL).

COMPLAINT- 18

**Lee & Lee, PS**
1001 4th Ave., Ste. 4368
Seattle, WA  98154
(206) 458-6986

1
2
3
4
5
6
7
8

> The NDA will be based primarily on data from the PERSIST-1
> Phase 3 trial —as well as data from Phase 1 and 2 studies of
> pacritinib—and additional information requested by the FDA,
> including a separate study report and datasets for the specific
> patient population with low platelet counts of less than 50,000 per
> microliter (<50,000/uL) for whom there are no approved drugs.
> Submission of an NDA after a single Phase 3 trial under
> accelerated approval, instead of waiting to complete two Phase 3
> trials, could potentially reduce time to market by up to 14 months.

9
10

45.   On November 5, 2015, Defendants caused the Company to file its Quarterly Report with the SEC on Form 10-Q for the period ending September 30, 2015.

11
12

46.   Also, on November 5, 2015, Defendants caused the Company to issue a press release, disclosing its quarterly results and providing the following guidance regarding the PERSIST clinical trials:

13
14
15
16
17
18
19
20

> "We are focused on preparing our NDA submission for pacritinib
> and are on track to submit our application to the FDA this quarter,"
> said James A. Bianco, M.D., CTI BioPharma's President and CEO.
> "We also remain committed to completing the second Phase 3 trial
> of pacritinib, PERSIST-2, which we believe could serve as a post-
> approval confirmatory trial in the event our NDA application is
> accepted and approved under accelerated approval.  Additionally,
> we look forward to upcoming data presentations of pacritinib and
> tosedostat studies at the ASH Annual Meeting in December."

21
22
23
24
25
26

> **Third Quarter 2015 and Recent Highlights**
> In September 2015, announced plans to submit a new drug
> application (NDA) to the U.S. Food and Drug Administration
> (FDA) with partner Baxalta Inc. for pacritinib, an investigational
> oral kinase inhibitor with specificity for JAK2, FLT3, IRAK1 and
> CSF1R for the treatment of patients with myelofibrosis, in the
> fourth quarter of 2015 and to request accelerated approval for the

COMPLAINT- 19

**Lee & Lee, PS**
1001 4th Ave., Ste. 4368
Seattle, WA  98154
(206) 458-6986

treatment of patients with intermediate and high-risk myelofibrosis with low platelet counts of less than 50,000 per microliter (<50,000/uL) for whom there are no approved drugs. Priority review of the application will be requested at the time of NDA submission.

In September 2015, completed registered direct offering resulting in net proceeds of approximately $15.1 million and in October 2015, completed underwritten public offering resulting in net proceeds of approximately $46.5 million.

In November 2015, announced the upcoming presentations of data highlighting pacritinib and tosedostat at the 57th American Society of Hematology Annual Meeting (ASH) to be held December 5-8, 2015, in Orlando, FL.

47.     The above statements were materially false and/or misleading when made because Defendants failed to disclose: (1) that pacritinib was attributed as a potential cause in the death and injuries of several patients; (2) that the Company's clinical trials showed the dangers of pacritinib usage; (3) that the Company's new drug application for pacritinib would likely be withdrawn; (4) that, as such, the Company's future revenues were impaired; (5) that the Company lacked adequate internal controls; and (6) that, as a result of the foregoing, the Company's financial statements and Defendants' statements about CTI BioPharma's business, operations, and prospects, were materially false and misleading at all relevant times.

### Disclosures at the End of the Relevant Period

48.     On February 8, 2016, Defendants caused the Company to issue a press release announcing that a partial clinical hold has been placed on pacritinib by the FDA.  Under the FDA's clinical hold, the Company, "may not enroll new patients or start pacritinib as an initial or crossover treatment, and (ii) patients on pacritinib not deriving benefit after 30-weeks of pacritinib treatment should stop pacritinib."   The Company further disclosed that, "[i]n its written notification, the FDA cited the reasons for the partial clinical hold were that it identified

COMPLAINT- 20

Lee & Lee, PS
1001 4th Ave., Ste. 4368
Seattle, WA  98154
(206) 458-6986

the following fatal and life-threatening safety issues in pacritinib-treated patients: heart failure, hemorrhage including intracranial hemorrhage, and arrhythmias including sudden death, and the FDA has also noted excess mortality in pacritinib-treated patients compared to the control arm in the PERSIST-1 clinical btrial evaluating pacritinib."

49.     On this news, shares of CTI declined $0.68 per share, or over 60% to close at $0.44 on February 8, 2016, on unusually heavy volume.

50.     On February 9, 2016, Defendants caused the Company to issue a press release announcing that the FDA had placed a full clinical hold on pacritinib.  The Company stated in relevant part:

> On February 8, 2016, the U.S. Food and Drug Administration (the "FDA") notified the Company that a full clinical hold has been placed on pacritinib (IND 078406), the Company's investigational oral kinase inhibitor with specificity for JAK2, FLT3, IRAK1 and CSF1R. A full clinical hold is a suspension of the clinical work requested under an investigational new drug application. Under the full clinical hold, all patients currently on pacritinib must discontinue pacritinib immediately, and the Company may not enroll any new patients or start pacritinib as initial or crossover treatment. In its written notification, the FDA noted interim overall survival results from PERSIST-2 showing a detrimental effect on survival consistent with the results from PERSIST-1, and that deaths in PERSIST-2 in pacritinib-treated patients include intracranial hemorrhage, cardiac failure and cardiac arrest.
>
> The FDA made recommendations that supersede the recommendations made by the FDA in connection with the partial clinical hold imposed by the FDA on February 4, 2016. The current recommendations include conducting Phase 1 clinical trials for dose exploration of pacritinib in patients with myelofibrosis, submitting final study reports and datasets for PERSIST-1 and

**Lee & Lee, PS**
1001 4th Ave., Ste. 4368
Seattle, WA  98154
(206) 458-6986

PERSIST-2, providing certain notifications, revising relevant statements in the related Investigator's Brochure and informed consent documents and making certain modifications to protocols. In addition, the FDA recommended that the Company request a meeting prior to submitting a response to full clinical hold.

The Company has withdrawn its previously submitted new drug application for pacritinib until the Company has had a chance to evaluate appropriate steps for pacritinib. All clinical investigators worldwide have been delivered a notice of the full clinical hold.

51.     On this news the Company's shares fell over 40% during intraday trading on February 10, 2016, on unusually heavy volume of over 15 million shares.

**Additional Information**

52.     On May 10, 2016, Defendants caused the Company to file its Form 10-Q for the first quarter ended March 31, 2016, disclosing for the first time that the Company had received a subpoena back in January 2016, even before the revelations concerning the partial and full clinical holds had been disclosed in early February 2016. The Form 10-Q stated in relevant part:

We are also in the process of providing documents in response to a subpoena received from the SEC in January 2016.   The SEC's subpoena requests, among other things; internal and external communications related to pacritinib Phase 3 trials, including communications with the independent data monitoring committee, or IDMC, for pacritinib's Phase 3 trials, our steering committee, our board of directors, our audit committee, representatives of Baxter and Baxalta, and the Food and Drug Administration, and other documents related to pacritinib. We believe that the SEC is seeking to determine whether there have been possible violations of the antifraud and certain other provisions of the federal securities laws related to the Company's disclosures concerning, among other things, the clinical test results of pacritinib.

COMPLAINT- 22

Lee & Lee, PS
1001 4th Ave., Ste. 4368
Seattle, WA  98154
(206) 458-6986

53.     Approximately four months transpired before Defendants publicly disclosed that the SEC was conducting an investigation into "possible violations of the anti-fraud provisions of the federal securities laws" relating to CTI's disclosures regarding clinical test results involving pacritinib.

**DAMAGES TO CTI CAUSED BY THE INDIVIDUAL DEFENDANTS**

54.     Plaintiffs, derivatively on behalf of CTI, seek relief for the damage sustained, and to be sustained, by CTI as a result of Defendants' breaches of their fiduciary duties and knowing and/or intentional behavior. Defendants' breaches of their fiduciary duties have proximately caused, and will continue to cause, Genworth to suffer substantial monetary damages as a result of the wrongdoing herein, including, among other things:

(a)     costs incurred from investigating, defending and paying any settlement or judgment in the Securities Class Actions[1] for violations of federal securities laws;

(b)     costs incurred from conducting additional studies and/or for pacritinib in patients with myelofibrosis;

(c)     damage to CTI's reputation and good will (including perhaps irreparable damage to CTI's reputation and credibility with insurance and securities regulators, and to CTI's reputation and credibility in the business, insurance, and financial communities);

(d)     resultant loss of business and business opportunities;

(e)     increased costs of capital;

(f)     a huge loss in market value and stockholder equity; and

(g)     costs incurred in connection with the SEC investigation and possible fines and/or penalties based on the SEC's findings.

55.     CTI has been directly and substantially injured by reason of Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company.  Plaintiff, as a stockholder and representative of CTI, seek damages and other relief for the Company, in an amount to be proven at trial.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

---

[1]     The cases are *Ahrens et al. v. CTI Biopharma Corp. et al.*, Case No: 1:16-cv-01044 and *McGlothin v. CTI Biopharma Corp., et al.*, Case No. 2:16-cv-00216.

COMPLAINT- 23

Lee & Lee, PS
1001 4th Ave., Ste. 4368
Seattle, WA  98154
(206) 458-6986

56.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by Defendants.

57.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

58.     Plaintiff is a current owner of CTI stock and has continuously been an owner of CTI stock during all times relevant to Defendants' illegal and wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

59.     During wrongful course of conduct at the Company, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

60.     The CTI Board is currently comprised of seven (7) members – Defendants J. Bianco, Love, Nudelman, Singer, Telling, Tuckson and non-party Perry.  Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, four (4), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

61.     The Director Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its future prospects.  Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Director Defendants had knowledge of material non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

62.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

63.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously

**COMPLAINT- 24**

**Lee & Lee, PS**
1001 4th Ave., Ste. 4368
Seattle, WA  98154
(206) 458-6986

prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

64.     The Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

65.     The Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

66.     Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, the Director Defendants are unable to comply with their fiduciary duties and prosecute this action.  Each of them is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending themselves in the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

67.     Additionally, each of the defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## THE DIRECTOR DEFENDANTS ARE
## NOT INDEPENDENT OR DISINTERESTED

**Defendants J. Bianco**

68.     Defendant J. Bianco is the principal founder of CTI and has served as the CEO and Director of the Company since September 1991.  He also serves as the Company's President since July 2012, and previously served as President from February 1992 through July 2008.  As conceded by the Company in the 2016 Proxy, J. Bianco, as an officer of CTI, is not an independent director due to his insider status.

**COMPLAINT- 25**

69.     J. Bianco is the brother of Defendant L. Bianco, who is a named Defendant in the instant action and in the Securities Class Actions.

70.     Further, Defendant J. Bianco is not disinterested or independent, and therefore, is incapable of considering demand because J. Bianco (as CEO) is an employee of the Company who derives substantially all of his income from his employment with CTI, making him not independent.  As such, J. Bianco cannot independently consider any demand to sue himself for breaching his fiduciary duties to CTI, because that would expose him to liability and threaten his livelihood.

71.     Accordingly, J. Bianco lacks independence from Defendants Love, Nudelman, and Telling (also non-party Perry), defendants who are not disinterested and who exert influence over J. Bianco's compensation by virtue of their positions as representing the entire Compensation Committee.

72.     This lack of independence and financial benefits received by J. Bianco renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

73.     Further, Defendant J. Bianco was a member of the Company's Scientific Advisory Board, which was responsible for assisting the Board in its oversight of the Company's oncology portfolio and clinical trial design.  Defendant J. Bianco signed or authorized the signing of the Registration Statement/Prospectus supplement that contained false and misleading statements and is a named defendant in the Securities Class Actions and therefore faces a substantial likelihood of liability, rendering him incapable of independently exercising his business judgment and demand futile.

**Defendant Singer**

74.     Defendant S2inger is one of the Company's founders and currently serves as the Executive Vice President, Chief Scientific Officer, Interim Chief Medical Officer and Global Head of Translational Medicine.  Singer has also served as a Director of CTI since the Company's inception in September 1991.

75.     Defendant Singer, as an officer of CTI, is not an independent director due to his insider status.

COMPLAINT- 26

Lee & Lee, PS
1001 4th Ave., Ste. 4368
Seattle, WA  98154
(206) 458-6986

76.     Further, Defendant Singer is not disinterested or independent, and therefore, is incapable of considering demand because Singer (as Executive Vice President, Chief Scientific Officer, Interim Chief Medical Officer and Global Head of Translational Medicine) is an employee of the Company who derives substantially all of his income from his employment with CTI, making him not independent.  As such, Singer cannot independently consider any demand to sue himself for breaching his fiduciary duties to CTI, because that would expose him to liability and threaten his livelihood.

77.     Accordingly, Singer lacks independence from Defendants Love, Nudelman and Telling (also non-party Perry), defendants who are not disinterested and who exert influence over Singer's compensation by virtue of their positions as representing the entire Compensation Committee.

78.     This lack of independence and financial benefits received by Singer renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

79.     Further, Defendant Singer was a member of the Company's Scientific Advisory Board, which was responsible for assisting the Board in its oversight of the Company's oncology portfolio and clinical trial design.  Defendant Singer signed or authorized the signing of the Registration Statement/Prospectus Supplement that contained false and misleading statements and is a named defendant in the Securities Class Actions and therefore faces a substantial likelihood of liability, rendering him incapable of independently exercising his business judgment and demand futile.

**Defendant Love**

80.     Defendant Love is currently the Chair of the Audit Committee and is described by the Company as an "audit committee financial expert," as defined under the rules and regulations of the SEC and that he has accounting and related financial management expertise within the meaning of the NASDAQ Stock Market rules.  He is also a member of the Compensation Committee and the Nominating and Governance Committee.

**Defendant Nudelman**

81.     Nudelman is the Chair of the Nominating and Governance Committee and is a member of the Audit Committee and the Compensation Committee.

COMPLAINT- 27

82.     Further, Defendant Nudelman signed or authorized the signing of the Registration Statement/Prospectus Supplement that contained false and misleading statements and is a named defendant in the Securities Class Actions and therefore faces a substantial likelihood of liability, rendering him incapable of independently exercising his business judgment and demand futile.

**Defendant Telling**

83.     Defendant Telling is the Chair of the Compensation Committee, and is also a member of the Audit Committee.  According to the 2016 Proxy, the Company stated "Dr. Telling's business and industry experience as well as experience as a director of public companies were the primary qualifications that have led the Board to conclude that he should serve as a director of the Company."

84.     In May 2007, the Company formed Aequus, a majority-owned subsidiary of which the Company's ownership was approximately 60% as of December 31, 2015.  The Company entered into a license agreement with Aequus whereby Aequus gained rights to certain technology known as the Genetic Polymer™.

85.     In May 2007, the Company entered into an agreement to fund Aequus in exchange for a convertible promissory note.  The terms of the note provide that (i) interest accrues at a rate of 6% per annum until maturity, (ii) in the event the note balance is not paid on or before the maturity date, interest accrues at a rate of 10% per annum and (iii) prior to maturity, the note is convertible into a number of shares of Aequus equity securities equal to the quotient obtained by dividing (1) the outstanding balance of the note by (2) the price per share of the Aequus equity securities.  While the original note matured and was due and payable in May 2012, in June 2015, the Company and Aequus entered into an amendment to the note pursuant to which the maturity date was extended to June 30, 2016.  In addition, the Company and Aequus are party to a services agreement to provide certain administrative and research and development services to Aequus. The amounts charged for these services, if unpaid by Aequus within thirty days, will be considered additional principal advanced under the promissory note.  The Company funded Aequus $2.3 million during the year ended December 31, 2015, including amounts advanced in association with the services agreement. The Aequus note balance, including accrued interest, was approximately $11 million as of December 31, 2015.

COMPLAINT- 28

**Lee & Lee, PS**
1001 4th Ave., Ste. 4368
Seattle, WA  98154
(206) 458-6986

86.     Defendants J. Bianco and Singer are minority shareholders of Aequus, each owning approximately 4.3% of the equity in Aequus as of December 31, 2015. Both J. Bianco and Singer are members of Aequus' Board.  Additionally, Telling owns approximately 3.8% of Aequus as of December 31, 2015, and is also a member of Aequus' Board.  In 2015, Telling earned $5,000 in fees for his service on the Board of Aequus and an award of **600,000 restricted shares of Aequus** with a grant date fair value of $120,000.  This compensation was provided by Aequus to Telling.  Further, L. Bianco provides certain consulting services to Aequus, including financial guidance business development services.

87.     Further, Defendant Telling signed or authorized the signing of the Registration Statement/Prospectus Supplement that contained false and misleading statements and is a named defendant in the Securities Class Actions and therefore faces a substantial likelihood of liability, rendering him incapable of independently exercising his business judgment and demand futile.

**Defendant Tuckson**

88.     Defendant Tuckson is a member of the Nominating and Governance Committee. According to the 2016 Proxy, the Company stated "Dr. Tuckson's experience as a healthcare executive and consultant across health and medical care sectors were the primary qualifications that have led the Board to conclude that he should serve as a director of the Company."

89.     Further, Defendant Tuckson signed or authorized the signing of the Registration Statement/Prospectus Supplement that contained false and misleading statements and is a named defendant in the Securities Class Actions and therefore faces a substantial likelihood of liability, rendering him incapable of independently exercising his business judgment and demand futile.

**Non-Party Perry**

90.     Perry is the President of BVF Partners and portfolio manager for the underlying funds managed by the firm.  BVF Partners is a private investment partnership that has focused on small-cap, value oriented investment opportunities for more than 20 years.  BVF owns 15.97% of all the outstanding shares of the Company stock.

91.     Perry (an individual who has an 15.97% controlling interest in the Company as President of BVF Partners) suffers from conflicts of interest and divided loyalties that preclude him from exercising independent business judgment

**Additional Information**

**Lee & Lee, PS**
1001 4th Ave., Ste. 4368
Seattle, WA  98154
(206) 458-6986

92.     Further, during the Relevant Period, Defendants Love, Nudelman, and Telling served as members of the Audit Committee.   Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*:

> Oversee the accounting and financial reporting processes of the Corporation and audits of the financial statements of the Corporation;

> Assist the Board in oversight and monitoring of (i) the integrity of the Corporation's financial statements, (ii) the Corporation's compliance with legal and regulatory requirements, (iii) the independent auditors' qualifications, independence and performance, and (iv) the Corporation's internal controls over financial reporting and systems of disclosure controls and procedures;

> Prepare any report that the rules of the Securities and Exchange Commission (the "SEC") require be included in the Corporation's annual proxy statement;

> Provide the Board with the results of its oversight and monitoring and recommendations derived therefrom; and

> Provide the Board with such additional information and materials as it may deem necessary to make the Board aware of significant financial matters that require their attention.

93.     Defendants Love, Nudelman, and Telling breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting issues and deficiencies described above.  Therefore, Defendants

COMPLAINT- 30

Love, Nudelman, and Telling face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## FIRST CAUSE OF ACTION

### (Against Defendants for Breach of Fiduciary Duties)

94.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

95.     Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

96.     Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

97.     Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  In breach of their fiduciary duties owed to CTI, Defendants caused and facilitated the Company to issue materially false and misleading statements concerning the Company's business, financial performance and condition and the adequacy of its internal controls, resulting in the commencement of the Securities Class Actions, and failed to properly oversee CTI's business, rendering them personally liable to the Company for breaching their fiduciary duties.

98.     Defendants had actual or constructive knowledge that Defendants caused and facilitated the Company to issue materially false and misleading statements concerning the Company's business, financial performance and condition and the adequacy of its internal controls, resulting in the commencement of the Securities Class Actions, and effect of artificially inflating the price of CTI's common stock.  Defendants had actual knowledge of the above misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

99.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

COMPLAINT- 31

Lee & Lee, PS
1001 4th Ave., Ste. 4368
Seattle, WA  98154
(206) 458-6986

100.    As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against Defendants for Gross Mismanagement)

101.    Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

102.    By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

103.    As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of millions of dollars.

104.    Because of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

## THIRD CAUSE OF ACTION

### (Against Defendants for Unjust Enrichment)

105.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein

106.    By their wrongful acts and the omissions of material fact that they caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

107.    During the Relevant Period, Defendants either received bonuses, stock options, or similar compensation from the Company that was tied to the financial performance or artificially inflated valuation of the Company or received compensation that was unjust in light of Defendants' bad faith conduct.

COMPLAINT- 32

**Lee & Lee, PS**
1001 4th Ave., Ste. 4368
Seattle, WA  98154
(206) 458-6986

108.   Plaintiff, as a shareholder and a representative of the Company, seeks restitution from Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by Defendants due to their wrongful conduct and breach of their fiduciary duties.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.   Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.   Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.   Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.   Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated: August 9, 2016


**LEE & LEE, PS**


By: */s Bethany C. Mito*
   Nelson Lee – WSBA #23590
   nelson.lee@leeandleelaw.com
   Bethany Mito – WSBA # 42918
   bethany.lee@leeandleelaw.com
   1001 4th Ave., Suite 4368
   Seattle, WA 98154
   Telephone:(206) 458-6986
   Facsimile: (206) 458-6816


COMPLAINT- 33

**Lee & Lee, PS**
1001 4th Ave., Ste. 4368
Seattle, WA  98154
(206) 458-6986

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna – NYBA #2009546
tjmckenna@gme-law.com
Gregory M. Egleston – NYBA #2891455
gegleston@gme-law.com
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone:      (212) 983-1300
Facsimile:      (212) 983-0383

*Counsel for Plaintiff*

COMPLAINT- 34

**Lee & Lee, PS**
1001 4th Ave., Ste. 4368
Seattle, WA  98154
(206) 458-6986